1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOE H. BANKHEAD,                         No.  2:15-cv-0642-EFB P

12                  Petitioner,

13         vs.                                ORDER AND FINDINGS AND
                                              RECOMMENDATIONS
14   DAVID DAVEY,[1]

15                  Respondent.

16

17         Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on September 27, 2011 in the Solano County Superior Court on charges of voluntary

20   manslaughter pursuant to California Penal Code Section 192(A).  He seeks federal habeas relief

21   on the following grounds: (1) the trial court erroneously instructed the jury on voluntary

22   manslaughter; (2) the prosecutor improperly excluded African American jurors and the trial court

23   erroneously denied his challenge made pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986); and

24   (3) his *Miranda* rights were violated when the trial court declined to suppress all or most of his

25         _____

26         [1] Pursuant to 28 U.S.C. § 2254, a person in custody pursuant to a state court judgment
     must name the "state officer who has custody" of him as the respondent.  *See* Rule 2(a) of the
27   Rules Governing Habeas Corpus Cases Under Section § 2254.  Petitioner improperly named the
     "Attorney General of the State of California" as the respondent.  He is incarcerated at Corcoran
28   State Prison and, accordingly, the court has *sua sponte* substituted the warden of that facility as
     the respondent.

                                              1

statement made to Detective Mark Bassett.  Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

**I.  Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the First Appellate District provided the following summary:

> **Prosecution Case**
>
> Thelma Washington lived in an apartment in Vallejo in a house that had been divided into two apartments; the victim, Adrian Williams, lived in the second apartment. Washington's caregiver, Lawrence Newson, was in her apartment every day. Williams was thin and frail; he walked with a cane and one side of his body seemed paralyzed.
>
> Appellant and Williams were friends. Washington and Newson last saw Williams alive in appellant's company, sometime during the day on December 31, 2009. Early the morning of January 1, 2010, appellant knocked on Washington's window or door. Newson responded, and appellant asked Newson if he had seen Williams. Appellant returned asking about Williams the next day; he said he had knocked on Williams's door but no one had answered. Appellant returned again the following morning, January 3; appellant said he and Williams had been drinking on New Year's Eve and got into an argument. He also said he was concerned because Williams was sickly and had not been feeling well. The same day, appellant called Lillie Hurd, who owned the building where Williams and Washington lived. Appellant told Hurd that he had beaten up Williams during a fight on New Year's Eve.
>
> On January 5, 2010, on Hurd's suggestion, appellant called 911 for assistance. Vallejo Police Officer Munoz arrived at Williams's home at 5:00 p.m. on January 5, in response to a call for a welfare check. Munoz was told the caller was concerned because he had not seen a friend for a few days; appellant met Munoz in front of the residence. Appellant told Munoz that Williams suffered from seizures, but he did not say anything about a fight. After Munoz received no response at the door, he called the fire department to force entry into Williams's apartment.
>
> Once inside, Munoz saw Williams on the floor with blood and other fluid coming from his mouth. Williams was breathing and had a pulse, but he was not conscious. According to a forensic pathologist, Williams was admitted to a hospital in a "vegetative state." He had many broken facial bones and a large subdural hematoma. Williams died in March 2010 and it was determined that the cause of death was "blunt force trauma to the head, with complications." The forensic pathologist testified there were at least four impacts on Williams's face, it took a lot of force to break

Williams's cheekbone, and Williams's injuries were not due to falling from a standing position.

An expert in blood spatter pattern interpretation testified that, based on observations of separate spatter areas, Williams was struck by at least three or four blows. There were small blood spatters, which indicated the use of considerable amount of force.

On January 8, 2010, former Vallejo Police Detective Mark Bassett interviewed appellant about Williams. A recording of the interview was played for the jury. Appellant said he had known Williams since childhood. He arrived at Williams's house on the afternoon of December 31, 2009, and appellant and Williams spent the afternoon and evening together. Both were drinking, and they also shared some crack cocaine, which appellant said made him paranoid. He and Williams fought. Appellant wanted to leave, but Williams would not let him. Appellant explained, "I was leaving and he grabbed me and ... I punched him." He also stated, "I kind of snapped him and ... then when he was going down I snapped him again." He admitted hitting Williams two or three times. He denied hitting Williams very hard or hitting him in the eye or the cheek.

**Defense Case**

A forensic pathologist testified for the defense that she could not tell from looking at Williams's "CT" scans whether his injuries were caused by punches, a fall, or another mechanism. She believed most of the facial fractures Williams sustained involved thin bones that were easily broken, and the cheekbone fracture could have been caused by falling onto a hard object. She believed Williams was struck at least two times.

An expert in blood spatter analysis testified for the defense that certain spatters were of "fairly low velocity." He did not disagree that the spatter pattern showed at least three or four blows were struck.

*People v. Bankhead*, 2013 WL 6000890, at *1–2 (Cal.App. 1 Dist., 2013) (unpublished).

**II.  Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S. 34 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's

/////

4

decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

/////

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

## III. Petitioner's Claims

### A. <u>Voluntary Manslaughter Instruction</u>

Petitioner contends that the trial court erred in giving an instruction on voluntary manslaughter because there was insufficient evidence to support either a finding of provocation under a heat of passion theory or a belief in an imminent threat necessary to support an imperfect self-defense theory. ECF No. 1 at 6.[3] The court of appeal, in the last reasoned decision, rejected this claim:

> Over the prosecutor's objection, appellant asked for and received jury instructions on lesser included offenses, including involuntary manslaughter and voluntary manslaughter under both heat of passion and imperfect self-defense theories. The Supreme Court has explained the relationship between murder and voluntary manslaughter as follows: "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of ... voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice ... when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or ... kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.]' [Citations.] [¶] These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by negating the element of malice that otherwise inheres in such a homicide [citation].' [Citation.]" (*People v. Rios* (2000) 23 Cal.4th 450, 460–461 (*Rios* ).)
>
> Appellant contends the trial court erred in instructing the jury on voluntary manslaughter because there was no substantial evidence (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643) supporting a finding of provocation under the heat of passion theory or belief in an imminent threat under the imperfect self-defense theory. The contention is forfeited because appellant's counsel requested that the trial court give the voluntary manslaughter instructions. (*People v. Wader* (1993) 5 Cal.4th 610, 658 [when defense counsel makes a

---

[3] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

"conscious and deliberate tactical choice to request a particular instruction" the invited error doctrine bars an argument on appeal that the giving of the instruction was error]; *see also People v. Lee* (2011) 51 Cal.4th 620, 645.)

We reject appellant's argument that counsel's request for the instructions was not a deliberate tactical choice. Counsel's request was express and unambiguous, it was made in the face of the prosecutor's argument that there was no evidentiary basis for the instructions, and there is no indication the request was the result of ignorance or mistake. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.) It appears counsel believed it was tactically advantageous for the jury to have an alternative between murder and involuntary manslaughter, even if the evidence supporting a conviction for voluntary manslaughter rather than murder was weak.

Appellant also argues the invited error doctrine does not apply to requests for instructions on lesser included offenses, as opposed to requests that an instruction on a lesser not be given, but he cites no authority supporting that proposition. The invited error doctrine was applied in directly analogous circumstances in *People v. Barnard* (1982) 138 Cal.App.3d 400, 409, which concluded, "since the defendant's trial counsel requested the instruction on the lesser included offense of possession, the doctrine of invited error applies, and [the] defendant will not be heard to complain that the instruction he requested was in fact given by the judge and acted upon by the jury." (*See also People v. Kozel* (1982) 133 Cal.App.3d 507, 527; *People v. Williams* (1980) 102 Cal.App.3d 1018, 1025.)

We conclude that the invited error doctrine precludes appellant from arguing on appeal that the trial court erred in giving the voluntary manslaughter instructions.

*Bankhead*, 2013 WL 6000890, at *2–3. Petitioner subsequently filed a petition for rehearing, wherein he argued that the court of appeal misread the record when it stated that petitioner had requested the voluntary manslaughter instruction over the prosecution's objections. ECF No. 15-12 at 192-194 (Exhibit 7). The court of appeal summarily denied the motion for rehearing. *Id*. at 214 (Exhibit 8). Petitioner did not include this claim in his petition for review to the California Supreme Court.

The court notes that petitioner does not explicitly refer to a heat of passion or imperfect self-defense theory in his current petition. Rather, he argues only that "there was no evidentiary basis" for the voluntary manslaughter instruction. ECF No. 1 at 6. Respondent contends that the current claim is unexhausted insofar as petitioner's argument in state court was predicated on the notion that the verdict itself was not supported by substantial evidence, not that the jury was

8

misinstructed (as he argues here).  ECF No. 15-1 at 11.  Review of petitioner's opening brief on direct appeal indicates that he was claiming both that his conviction was not supported by sufficient evidence *and* that the trial court erred in giving a voluntary manslaughter instruction.  ECF No. 15-12 at 18.  The current petition, however, only explicitly raises the latter of the two claims.  ECF No. 1 at 6.  In fact, with respect to this claim, the petition is merely a verbatim restatement of the petition for rehearing's opening heading.  *Compare* ECF No. 1 at 6, *with* ECF No. 15-12 at 192.  The petition for rehearing did not speak to the evidentiary sufficiency of the verdict itself.  Instead, it argued that the court of appeal misconstrued the record when it determined (1) that petitioner requested the voluntary manslaughter instruction over the prosecution's objection and (2) that petitioner had failed to cite a case standing for the proposition that invited error does not apply to requests for instructions on lesser included offenses.  ECF No. 15-12 at 192-194.  Accordingly, the court construes this claim as challenging only instructional error and not the evidentiary sufficiency of the verdict.

### 1.   <u>Applicable Legal Standards</u>

Challenges to state jury instructions are grounded in state law and, accordingly, not generally cognizable on federal habeas review.  *Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the fourteenth amendment."  *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (internal quotations omitted).  A challenge to a trial court's jury instructions is reviewed under the standards in *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) – that is, whether the error had a substantial and injurious effect in determining the jury's verdict.  *See California v. Roy*, 519 U.S. 2, 5 (1996).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The reviewing court should consider an instruction in the context of the entire record rather than judging it in isolation.  *McGuire,* 502 U.S. at 72.

/////

## 2.    **Analysis**

Respondent argues that this claim is procedurally barred because the court of appeals relied on the invited error doctrine to reject it.  The United States Supreme Court has held that federal courts should "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This is because a federal court "has no power to review a state law determination that is sufficient to support the judgment" and consequently, "resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory."  *Id*.  The Ninth Circuit has held that, where a state court applied the doctrine of invited error to bar a claim, a federal habeas court may find that claim procedurally barred.  *See Leavitt v. Arave*, 383 F.3d 809, 832-33 (9th Cir. 2004) ("There is no reason that we should treat the invited error rule differently from other state procedural bars."); *see also Miller v. Oberhauser*, 293 F.2d 29, 31 (9th Cir. 1961) ("Petitioner requested the instruction to which he now objects.").  Here, petitioner requested the voluntary manslaughter instruction and the trial court issued it.  *See* Reporter's Transcript Vol. IV of V at 866-870 (Exhibit 2).  The court of appeal, as represented *supra*, then expressly invoked the invited error doctrine.

Petitioner might still proceed with this claim if he can demonstrate "a cause for the default, and prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice."  *High v. Ignacio*, 408 F.3d 585, 590 (9th Cir. 2005).  A habeas petitioner may demonstrate a miscarriage of justice if he demonstrates that "in light of all the evidence, including evidence not introduced at trial, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002).  Petitioner has failed to argue either cause and prejudice or that a fundamental miscarriage of justice will occur if this claim is not considered.  The only argument the petition does appear to raise is one grounded in state law.  Petitioner cites *People v. Prince*, 40 Cal.4th 1179 (2007), without explanation, though presumably he intends it to echo the argument raised in his petition for rehearing.  There, his appellate counsel relied on

*Prince* for the proposition that, under California law, the invited error doctrine does not apply to requests for instructions on lesser included offenses (as opposed to requests that an instruction on a lesser *not* be given). ECF 15-12 at 194-195. This issue sounds purely in state law, however, and a federal habeas proceeding is not the appropriate venue to relitigate it. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").

This claim is procedurally barred.

## B. *Batson* **Challenge**

Next, petitioner argues that the prosecution was racially discriminatory during jury selection and the trial court erred in denying his *Batson* challenge. ECF No. 1 at 6. The court of appeal denied this claim, reasoning:

> Exercising peremptory challenges on the basis of race violates the guarantee of equal protection of the laws under the Fourteenth Amendment to the United States Constitution (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson* )) and the right under the California Constitution to be tried by a jury drawn from a representative cross-section of the community (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler* )). (*People v. Huggins* (2006) 38 Cal.4th 175, 226 (*Huggins* ).) Appellant contends the prosecutor below exercised peremptory challenges on the basis of race and the trial court erred in rejecting appellant's objections thereto.
>
> Batson requires a three-step analysis in response to a defendant's claim that a prosecutor's peremptory challenges are race based:
>
> "First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." . . . Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal. [And although a party may exercise a peremptory challenge for any permissible reason or no reason at all [citations], 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination' [citation].
>
> "In evaluating a trial court's *Batson–Wheeler* ruling that a party has offered a race-neutral basis for subjecting particular prospective jurors to peremptory challenge, we are mindful that '[i]f the trial court makes a 'sincere and reasoned effort' to evaluate the

11

nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' In a case in which deference is due, '[t]he trial court's ruling on this issue is reviewed for substantial evidence.'" (*Huggins*, *supra*, 38 Cal.4th at pp. 226–227.)

On appeal, appellant objects to peremptory challenges to two prospective jurors, both of whom are African–American. First, Prospective Juror B.C. (B.C.) worked as a pharmacy technician at a state correctional institution. During questioning by the prosecutor about her work, B.C. stated, "when I see the inmates, I know that they've already been to trial, so I don't think that with what's happening here now—we're looking at what happened in his life before and determining if what happened is his fault, and that's all I can take from it." In answer to a follow-up question from the prosecutor, B.C. discussed a friend who was murdered by her husband, stating, "it sort of makes you wonder what could have happened in their life that would have caused him to get to the point where he would kill his wife, but I think I can put that aside, because that's something that happened in the past, and be fair to—to the guy here." In explaining her decision to use a peremptory challenge on B.C., the prosecutor stated "my primary concern with her was she was struggling with what happened in people's backgrounds to make them behave the way that they're behaving. She mentioned that on more than one occasion in relation to people who perpetrate crimes...." The prosecutor continued, "I found that to be troublesome, because as a juror, I want a person who is going to be looking at these discrete facts, what comes from the evidence, and not thinking about what happened in somebody's background to make them behave this way."

The trial court denied the *Batson/Wheeler* claim as to B.C., reasoning, "I do find there would be a prima facie case, but I do accept the prosecutor's reasons as to [B.C.]. There are some reasons based on the record, based on the questioning of [B.C.], that would support a race neutral peremptory against her. That being what [B.C.] said regarding a comment about the background. That would be a race neutral reason. I accept that explanation as to [B.C.]." We conclude B.C.'s comments quoted above constitute substantial evidence supporting the trial court's finding that appellant did not prove purposeful racial discrimination in the peremptory challenge to B.C.

The second peremptory challenge at issue was as to Prospective Juror J.M. (J.M.). His questionnaire indicated he had completed 12th grade, but provided no information concerning a "degree" or "present employment." The prosecutor explained her decision to challenge J.M. as follows: "My biggest concern with [J.M.] was his immaturity. Not only was he physically bopping around and moving his head, distracted is what he appeared to me. He had his headphones in his pocket, and every time he left that box, he immediately stuck his headphones in his ears. [¶] My concern here is that he is not necessarily paying attention to the proceedings. He's isolating himself from everyone else. Given that, in combination with his response to my question of 'Are you able and willing to do this?' his response was, 'I know how to play the game. I can follow

the rules of the game'—that was concerning to me. That tells me he's not taking this seriously. This is not a game. [¶] In addition, his questionnaire ... is completely devoid of any information. He has no high school degree. He has no children. He has no job. He has no life experience. I think it is important to note he is by far the youngest person on this jury. And given that he has no life experience whatsoever, and his lack of seriousness and his lack of maturity, I have great concerns about his ability to sit as a juror."

The trial court denied the *Batson/Wheeler* claim as to J.M., reasoning, "I am somewhat concerned as to [J.M.], although in terms of the explanation, I am going to find it to be credible. There is this basis that [the prosecutor] has described, although it is based on the subjective factors which are certainly more difficult to gauge. The nature of peremptory strikes—at this point I don't find it to be based on race. I will—I accept the prosecutor's representation as to the reasons." On appeal, appellant argues, as he did below, that other jurors also put down 12th grade as their highest education level completed. However, the prosecutor also stated her peremptory challenge was based on J.M.'s perceived immaturity and distractedness; the subjective nature of those assessments does not render them improper bases for a peremptory challenge. (*People v. Mai* (2013) 57 Cal.4th 986, 1053, as modified Oct. 3, 2013 (*Mai* ) ["the prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court"]; see also *People v. Lenix* (2008) 44 Cal.4th 602, 622 ["[m]yriad subtle nuances" shape an assessment of a prospective juror's answers during voir dire "including attitude, attention, interest, body language, facial expression and eye contact"].) Moreover, the prosecutor emphasized J.M.'s comments analogizing the trial process to a game. Even if his comment can be interpreted in different ways, the prosecutor's assertion that the comment gave her concern was not "implausible or fantastic." (*Huggins*, *supra*, 38 Cal.4th at p. 227; see also *Mai*, at p. 1051 ["the prosecutor was not obliged to accept" defendant's proffered interpretation of a juror's "ambiguous remarks"].) We conclude substantial evidence supports the trial court's conclusion that appellant did not prove purposeful racial discrimination in the peremptory challenge to J.M.

The trial court did not err in denying appellant's *Batson /Wheeler* claim.

*Bankhead*, 2013 WL 6000890, at *4–6 (some internal citations omitted). Petitioner raised this claim in his petition for review to the California Supreme Court (ECF No. 15-12 at 231) (Exhibit 9)) which was summarily denied (*Id.* at 277) (Exhibit 10)).

### 1. <u>Applicable Legal Standards</u>

A prosecutor's purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause. *Batson*, 476 U.S. at 85. The United

States Supreme Court has noted that "a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race." *Eubanks v. Louisiana*, 356 U.S. 584, 585 (1958). It is also true, however, that a defendant has no right to a "petit jury composed in whole or in part of persons of his own race." *Batson*, 476 U.S. at 85. He is entitled only to a jury that was selected pursuant to nondiscriminatory criteria. *Id*. at 85-86.

A *Batson* challenge is evaluated pursuant to a three part test. First, the defendant must make a prima facie showing that the prosecution's use of a peremptory challenge was racially discriminatory. *Id*. at 96-97. Establishing a prima facie requires a defendant to show that: (1) he is a member of a cognizable racial group; (2) the prosecution removed members of that racial group from the venire; and (3) circumstances create an inference that the prosecution's challenges were racially motivated. *Tolbert v. Gomez*, 190 F.3d 985, 988 (9th Cir. 1999) (citing *Batson*, 476 U.S. at 96). Then, if a trial court finds that a prima facie case has been made, the burden shifts to the prosecutor to offer a race-neutral explanation for the challenge. *Id*. Finally, the trial court must determine whether the defendant has established purposeful discrimination. *Id*.

The Ninth Circuit has held that a state court's *Batson* decision should be reviewed with great deference by a federal habeas court:

> [T]he state court's decision will be upheld unless it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Indeed, in evaluating habeas petitions premised on a *Batson* violation, our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it. This is because the question of discriminatory intent largely will turn on evaluation of credibility and evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (internal quotation marks and citations omitted). The *Jamerson* court noted, however, that "[t]his seemingly straightforward standard becomes convoluted, though, when it is paired with the requirement that we conduct, in the first instance, the comparative analysis that the state court declined to perform." *Id*. Nevertheless, "[i]t is clear in these cases that AEDPA deference still applies, and the state court decision cannot

be upset unless it was based upon an unreasonable determination of the facts." *Id.* (internal quotation marks and citations omitted). The *Jamerson* court reconciled these requirements as follows:

> Combining these two requirements, we conclude that our evaluation of the state court's disposition of [petitioner's] *Batson* claim should proceed in two steps. To begin, we must perform in the first instance the comparative analysis that the state court declined to pursue. Then, we must reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine. In essence, we must assess how any circumstantial evidence of purposeful discrimination uncovered during comparative analysis alters the evidentiary balance and whether, considering the totality of the evidence, the state court's credibility determination withstands our doubly deferential review.

*Id.* at 1225-1226.

## 2. **Analysis**

Petitioner's trial counsel objected to the prosecutor's dismissal of two jurors – B.C. and J.M. ECF No. 15-7 at 118 (Exhibit 2). The trial court denied both challenges after crediting the race neutral reasons offered by the prosecutor for challenging each juror. *Id.* at 123, 132.

### a. **Juror B.C.**

Juror B.C., an African-American female, worked as a pharmacy technician at a state prison. ECF No. 15-6 at 110 (Exhibit 2); ECF No. 15-7 at 119 (Exhibit 2). During voir dire, the prosecution asked B.C. if she was 'qualified' to serve and B.C. answered in the affirmative:

> I make decisions every day. I was in the military for 23 years, and I am now - - I work at CMF, which is a prison in Vacaville, but I'm willing to do the job. I - - I wonder if it would be a problem about my working in the prison with inmates and possibly maybe seeing someone who was on the trial that I sat on, but I'm pretty sure I can do it because the trial is here, it's not there. When it's there, it's all over so - -

ECF No. 15-6 at 110 (Exhibit 2). The prosecutor then asked whether any other reasons might make serving difficult, to which B.C. answered:

> Well, like I said earlier, I did have - - I had a friend, a co-worker, who was murdered by her husband, and he was also a co-worker, and it did - - it - - it sort of makes you wonder what could have happened in their life that would have caused him to get to the point where he would kill his wife, but I think I can put that aside,

15

1  because that's something that happened in the past, and be fair to - -
2  to the guy here.

3  *Id*. at 110 – 111.  The prosecutor exercised a peremptory challenge to dismiss B.C. (*Id*. at 121)

4  and, when asked by the court to explain her decision to use the challenge, stated:

5  Just the same comments that I made at the bench, your honor, in
   that my primary concern with her was she was struggling with what
6  happened in people's backgrounds to make them behave the way
   that they're behaving.  She mentioned that on more than one
7  occasion in relation to people who perpetrate crimes, in relation to
   the people that she worked with at CMF.  I found that to be
8  troublesome, because as a juror, I want a person who is going to be
   looking at these discrete facts, what comes from the evidence, and
9  not thinking about what happened in somebody's background to
   make them behave this way. Given that and her close association
10  with CMF, I think that she was not my preference for a juror.

11  . . .

12  In this particular situation, I asked people specifically were they
   able to do it, were they willing to do it, and what barriers existed to
13  doing it.  And one of the barriers that [B.C.] expressed was that she
   had a struggle, and her struggle involved her work at CMF and how
14  she was resolving that struggle.  I listened to how she was resolving
   it, and I heard a relational thinker who was more focused on
15  backgrounds rather than on the facts here. That's the reason why I
   selected her as a peremptory.

16

17  ECF No. 15-7 at 119 - 122 (Exhibit 2).  The trial court found there to be a prima facie case of

18  racial discrimination, but went on to accept the prosecutor's race neutral reasons for challenging

19  B.C.  *Id*. at 123.

20      The record shows that no other non-black juror who was allowed to serve made similar

21  comments regarding a tendency to evaluate an accused's 'background.'  As such, the comparative

22  analysis does not introduce any new, relevant evidence.  *See Cook v. Lamarque*, 593 F.3d 810,

23  817 (9th Cir. 2010) (absence of an 'otherwise-similar' juror nullifies the value of a comparative

24  analysis).  Instead, this claim turns on the identical credibility question which confronted the trial

25  court, namely whether the prosecutor's stated reasons for challenging B.C. were mere pretext for

26  racial discrimination.  The trial court determined they were not and the court of appeal was not

27  unreasonable in accepting that finding.  *See Rice v. Collins*, 546 U.S. 333,

28  341-342 (2006)  ("Reasonable minds reviewing the record might disagree about the prosecutor's

16

credibility, but on habeas review that does not suffice to supersede the trial court's credibility

determination.").

### b. <u>Juror J.M.</u>

Juror J.M., an African-American male, indicated on his questionnaire that he had

completed twelfth grade, but left the form blank on the question of present employment. ECF

No. 15-3 at 35 (Exhibit 1). During voir dire, the prosecutor asked J.M. whether he was able to

serve on the jury, to which J.M. answered in the affirmative. ECF No. 15-6 at 106 (Exhibit 2).

When asked why, J.M. stated:

> We're under the roof of this building, and there are rules. And, hey,
> I mean, if you agree to play a game, you agree to play by those
> rules. Rules are rules.

*Id*. The prosecutor exercised a peremptory challenge to dismiss J.M. (*Id*. at 142-143) and later

offered the following rationale for doing so:

> My biggest concern with [J.M.] was his immaturity. Not only was
> he physically bopping around and moving his head, distracted is
> what he appeared to me. He had his headphones in his pocket, and
> every time he left that box, he immediately stuck his headphones in
> his ears.
>
> My concern here is that he is not necessarily paying attention to the
> proceedings. He's isolating himself from everybody else. Given
> that, in combination with his response to my question of "Are you
> able and willing to do this?" his response was, "I know how to play
> the game. I can follow the rules of the game" - - that was
> concerning to me. That tells me he's not taking this seriously. This
> is not a game.
>
> In addition, his questionnaire - - I don't know if the Court has seen
> the questionnaire. It is completely devoid of any information. He
> has no high school degree. He has no children. He has no job. He
> has no life experience. I think it is important to note he is by far the
> youngest person on this jury. And given that he has no life
> experience whatsoever, and his lack of seriousness and his lack of
> maturity, I have great concerns about his ability to sit as a juror.

ECF No. 15-7 at 126 (Exhibit 2). The trial court again found a prima facie case of discrimination,

but ultimately concluded that the prosecutor's proffered race neutral rationales for the challenge

were credible. *Id*. at 125, 132.

In his opening brief on direct appeal, petitioner emphasized that at least one other juror

offered the same answer to the questionnaire's education question. ECF No. 15-12 at 43 (Exhibit

3).  As respondent notes, however, the prosecutor's stated objection to J.M. serving as a juror was not merely that he was unemployed or that his questionnaire failed to state whether he had attained his high school degree.  Rather, it was her perception, gleaned from his youth, demeanor, and responses to her questions, that he lacked the necessary focus to make a good juror.  Such demeanor-based challenges are race-neutral and not uncommon.  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention) . . .").  Neither petitioner's pleadings nor the court's own review of the record provides an indication that any other juror was similar to J.M. in terms of the totality prosecutor's concerns.[4]  Accordingly, the court concludes that the comparative analysis finds no purchase here.

Having determined that the prosecutor's justifications are not belied by a comparative analysis, the court cannot find that the court of appeal was objectively unreasonable in accepting the trial court's credibility determination.

**C.    Petitioner's Statements to Detective Bassett**

Petitioner's last claim is that the trial court erred when it determined that he was only in custody after Bassett required him to present his hands for photographing.  He claims that he was in custody before that time and that he should have been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) prior to questioning.  The court of appeal considered and rejected this claim:

> Appellant contends the statement he gave to Bassett at the police station was given while he was in custody and should have been excluded because he was not advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda* ), prior to questioning.
>
> "An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position

---

[4] The court of appeal stated as much when, by way of a footnote, it noted that petitioner had failed to demonstrate "that any other jurors made comments or exhibited behaviors similar to those mentioned by the prosecutor in explaining her peremptory challenges to B.C. and J.M." *Bankhead*, 2013 WL 6000890, at *6 n.6.

would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395 (*Moore* ).) "The test for custody does not depend on the subjective view of the interrogating officer or the person being questioned. [Citation.] The only relevant inquiry is 'how a reasonable man in the suspect's shoes would have understood his situation.' [Citation.]" (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088–1089.) This determination is based on the totality of the circumstances; "no one factor is controlling." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster* ); see also *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 ["we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest"].) On appeal, "[w]e apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial. [Citation.]" (*Pilster*, at p. 1403; see also *Moore*, at p. 395.)

In the present case, Bassett testified at a pretrial evidentiary hearing on the *Miranda* issue that, on January 7 or 8, 2010, he left a voicemail message for appellant asking to speak about Williams. Bassett also testified he told appellant that he "needed to" speak to him. Appellant agreed to come to the police station and suggested a 1:30 p.m. meeting time. Bassett greeted appellant in the lobby, and they walked to an interview room in a secured area of the police station. Bassett asked appellant if he had any weapons and then, with appellant's consent, searched him for weapons. Bassett confirmed appellant was there "voluntarily" and told appellant, "you're free to leave at any time, you're not under arrest or anything like that. I just had some questions for you about what, what went on with [Williams]. So, just understand if you have, if you don't want to talk anymore, just let me know. We'll stop the interview and I'll walk you out and you can leave." Appellant said he understood. Nevertheless, Bassett had already decided he would be arresting appellant after the interview. The interview lasted about an hour. At some point Bassett asked appellant if he had any injuries to his hands. Appellant responded affirmatively, showed his hands to Bassett, and asked if he was required to allow Bassett to photograph his hands. Bassett responded that he was. After the interview, appellant asked if he was free to leave and Bassett told appellant he was under arrest.

The trial court concluded appellant was not in custody at the outset of the interview because he went voluntarily to the police station and spoke with Bassett. The interview became custodial more than halfway through, when Bassett told appellant he was required to allow Bassett to photograph his hands, and the subsequent portions of the interview were inadmissible. Nevertheless, the entirety of the interview was played for the jury because Bassett was cross-examined at trial regarding comments in the excluded portion of the interview.

19

On appeal, appellant argues he was in custody during most or all of the questioning. Appellant emphasizes that contact was initiated by Bassett, the questioning took place in a secured area of the police station, Bassett searched appellant for weapons, Bassett's questions made it clear appellant was being questioned as a suspect, and appellant was arrested after the interview.

The present case is analogous to the California Supreme Court's decision in *Moore*, *supra*, 51 Cal.4th 386. There, a police officer asked the defendant, who was the last person to see the victim alive, to come give a statement at the police station. (*Id*. at p. 396.) Once in the interview room at the station, a police investigator told the defendant he was not under arrest and was free to leave. (*Id*. at p. 402.) The defendant was not restrained, and he was interviewed for one hour and 45 minutes. (*Ibid*.) The questioning initially focused on filling in the details of the defendant's story as a witness rather than as a suspect; but, "[a]fter a while ..., the detectives interjected some more accusatory and skeptical questions." (*Ibid*.) The investigators asked the defendant whether he burglarized the victim's house; they urged the defendant to be honest; and they asked various questions about the defendant's prior arrests and other matters that "conveyed their suspicion of [the] defendant's possible involvement." (*Ibid*.) The police ultimately declined the defendant's request to be taken home and read the defendant the *Miranda* advisements. (*Moore*, at pp. 401–402.)

The Supreme Court concluded the defendant in *Moore* was not in custody during the bulk of the interview, reasoning, "At least until [the] defendant first asked to be taken home and his request was not granted, a reasonable person in [the] defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Moore*, *supra*, 51 Cal.4th at p. 403.) The court emphasized that the defendant had gone to the station voluntarily and was expressly told he was free to leave. (*Id*. at p. 402.) The court pointed out, "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.]" (*Moore*, at p. 402, italics omitted.) Regarding the accusatory questioning, the court noted that the interview as a whole was not "particularly intense or confrontational" and stated that "police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Ibid*.)

The present case is not materially distinguishable from *Moore*. There is no basis to conclude the atmosphere in the interview room in the present case was more coercive than the interview room in *Moore*. In *Moore*, there were two investigators involved in the questioning, while in the present case only Bassett was present, and the interview in *Moore* lasted significantly longer than the interview in the present case. Appellant was searched for weapons, which apparently did not occur in *Moore*, but that security precaution would not have conveyed to a reasonable person that they were not

free to leave. Portions of the interview were clearly accusatory: For example, Bassett probed appellant's failure to call the police more promptly, asked pointed questions about appellant's fight with Williams, and urged appellant to admit he punched Williams more than once. Nevertheless, as the trial court found, Bassett did not use intimidating or threatening tactics in questioning appellant. The questioning in the present case was not significantly more intense or confrontational than that in *Moore*, where the investigators accused the defendant of burglarizing the victim's home and stabbing her with a knife. (See *Moore*, *supra*, 51 Cal.4th at pp. 398–400.) Finally, although appellant heavily relies on the fact he was arrested after the interview, in *Moore* the defendant also was formally detained at the end of the interview (*id*. at pp. 401–402).

Appellant has failed to distinguish this case from *Moore* or direct us to more analogous authority. We follow *Moore* in concluding the trial did not err in concluding appellant was not in custody prior to the point at which Bassett required appellant to allow his hands to be photographed. The trial court did not err in admitting that portion of the interview at trial, and appellant does not contend the court erred in admitting the remainder of the interview following the cross-examination of Bassett.

*Bankhead*, 2013 WL 6000890, at *6–8 (some internal citations and citation marks omitted).

Petitioner raised this claim in his petition for review to the California Supreme Court (ECF No. 15-12 at 244 (Exhibit 9)) which was summarily denied (*Id*. at 277 (Exhibit 10)).

## 1. **Applicable Legal Standards**

The Supreme Court's *Miranda* decision requires that law enforcement officials, before questioning a suspect in custody, inform the suspect that:

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994).

An objective test is applied to determine whether a suspect is in custody for the purposes of *Miranda. J. D. B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). A court should inquire: (1) what were the overall circumstances surrounding the interrogation; and (2) in light of those circumstances, whether a reasonable person in the suspect's situation would have felt free to terminate the interrogation and leave. *Id*. The Supreme Court has held that:

21

> Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.

*California v. Beheler*, 463 U.S. 1121, 1125 (1983). A federal habeas court's review of a state court's *Miranda* decision is constrained by AEDPA. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). Accordingly, a state prisoner's *Miranda* claim may only be granted if the state court's decision was contrary to clearly established federal law as established by the Supreme Court or based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding. 28 U.S.C. § 2254(d).

### 2. Analysis

The record reflects that Bassett asked petitioner to come to the police station for an interview and petitioner agreed to do so. ECF No. 15-7 at 41-42 (Exhibit 2). In spite of having already made the decision to arrest petitioner once the interview was completed, *see Bankhead*, 2013 WL 6000890, at *6–8, Bassett nonetheless told petitioner upon his arriving at the station that their meeting was voluntary and he would be escorted from the station if, at any point, he didn't want to continue the interview. ECF No. 15-7 at 44. This suggests that Bassett intended the interview and questioning to evolve into a custodial arrest and raises the question of when that occurred.

Bassett took petitioner to an interview room and the two spoke for roughly half an hour to forty-five minutes. *Id*. at 45. Bassett estimated that, approximately half way through the interview, he asked petitioner to show him his hands in order to photograph their injuries. *Id*. at 46. Petitioner asked if he was required to do so and Bassett responded in the affirmative. *Id*. at 53-54. The trial court concluded that petitioner was not in custody until Bassett required petitioner to present his hands for photographing. *Id*. at 66-72. In reaching its decision, the trial court emphasized that petitioner had no clear indication he was a suspect when he entered the station, that Bassett told petitioner that the interview was voluntary, that petitioner was not restrained during the interview, that the interview was not long in duration, and the fact that

/////

Bassett did not make any intimidating or threatening comments during his questioning. *Id.* As noted *supra*, the court of appeal found no error in that determination.

Petitioner directs the court's attention to his petition for review to the California Supreme Court, wherein he argued that he was in custody once Bassett took control of his driver's license and never returned it.[5] ECF No. 15-12 at 255 (Exhibit 9). He emphasizes several elements of the interrogation which support an earlier finding of custody, including: (1) Bassett's questioning becoming increasingly confrontational over the course of the interrogation; (2) Bassett patting petitioner for weapons and taking his license prior to advising him he was free to leave; and (3) the interview taking place in a locked room in a non-public part of the station. *Id.* at 251-254. Petitioner's identification of factors which might weigh in favor of an earlier finding of custody does little to avail him where, as here, other factors relied upon by the state court to support a later finding are at least as convincing. As noted above, petitioner came to the police station of his own volition. *See United States v. Kim*, 292 F.3d 969, 974-975 (9th Cir. 2002) ("If the police ask - not order - someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."). Additionally, Basset told him at the outset of the interrogation that he was free to leave and both the Supreme Court and Ninth Circuit have repeatedly held that such statements strongly counsel against a finding of custody. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (declining to find custody where a suspect "came voluntarily to the police station, where he was immediately informed that he was not under arrest."); *see also United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ("We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time."). And although petitioner was questioned in a police station, there were no formal restraints on his movement in the interrogation room. *See Mathiason*, 429 U.S. at 495 ("[A] noncustodial situation is not converted

---

[5] The court of appeal noted that the record before it did not support petitioner's assertion that Bassett confiscated his driver's license. *Bankhead*, 2013 WL 6000890, at *7 n.8. It did not, however, have an opportunity to view the video of the interrogation because petitioner failed to transmit the recording to the court. *Id.* The court went on to conclude that, even if Bassett had confiscated petitioner's driver's license, it would not alter the custody determination. *Id.*

to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'").

The United States Supreme Court has emphasized that the question of whether a suspect is in custody for the purposes of *Miranda* requires application of a general standard to a specific case and, consequently, courts are afforded "more leeway" in making that determination. *Alvarado*, 541 U.S. at 664-65. And, under AEDPA review, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786. Thus, although it is troubling that Bassett had already decided he would be arresting appellant after the interview notwithstanding his statements to petitioner of being free to leave at the onset of the meeting, under the AEDPA standard the petition must be denied. A fairminded jurist could find under existing Supreme Court precedent that petitioner was not in custody prior to being told he was required to present his hands for photographing and habeas relief is foreclosed on that basis.

## IV. Conclusion

The parties have not consented to magistrate judge jurisdiction and, accordingly, the Clerk is directed to randomly assign a United States District Judge to this case.

Further, it is hereby RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue

24

in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  April 19, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE